CARLTON BLAKE CURRY v. PAUL CHRIST BAKER, a CITIZEN AND RESIDENT OF THE STATE OF NORTH CAROLINA, PAUL CHRIST BAKER, a CITIZEN AND RESIDENT OF THE STATE OF GEORGIA, AND EXPRESS FREIGHT SYSTEMS, INCORPORATED, a TENNESSEE CORPORATION

No. COA97-1059

(Filed 21 July 1998)

### 1. Motor Vehicles— car accident—injury—sufficiency of evidence

The trial court did not abuse its discretion in an action arising from an automobile accident by failing to grant defendants' motions for JNOV and a new trial where defendants contended that there was insufficient evidence that plaintiff sustained a traumatic brain injury in the collision.

### 2. Damages and Remedies— lost earning capacity—automobile accident

The trial court did not abuse its discretion in an action arising from an automobile accident by failing to grant defendants' motions for JNOV and for a new trial on the grounds of insufficient evidence to warrant submission of plaintiff's lost earning capacity where it was undisputed that plaintiff desired to become general manager of his company prior to the collision, he was on a very good career path and had the ability to do so within four or five years, and the expert's opinion of the value of plaintiff's lost earning capacity was based on the testimony of coworkers who were familiar with plaintiff's work habits and with the industry. Some degree of speculation is inherent in the determination of compensation from lost earning capacity; defendant's objection goes to the weight rather than the admissibility of the evidence.

### 3. Motor Vehicles— automobile collision—contributory negligence—instructions

There was no error in a negligence action arising from an automobile collision where defendants contended that the court erred by failing to instruct the jury on a driver's duty to reduce speed to avoid a collision and to determine that the movement can be made safely before turning. The court instructed the jury on the duty to keep a reasonable lookout and on a driver's duty upon entering an intersection under a green light. Any error would not have been prejudicial because there is no evidence of

**CURRY v. BAKER**

[130 N.C. App. 182 (1998)]

anything which would have put plaintiff on notice that defendants' truck was going to enter the intersection contrary to the red light governing its direction of travel; moreover, the jury found that plaintiff was not contributorily negligent.

Appeal by defendants from judgment entered 23 December 1996 and order entered 5 February 1997 by Judge Charles C. Lamm, Jr., in Mecklenburg County Superior Court. Heard in the Court of Appeals 2 June 1998.

*Smith Helms Mulliss & Moore, L.L.P., by James G. Exum, Jr., and Bradley R. Kutrow; and Brown & Montgomery, by R. Kent Brown, for plaintiff appellee.*

*Cranfill, Sumner & Hartzog, L.L.P., by William C. Robinson, for defendant appellant Express Freight Systems, Inc.*

*Hartsell, Hartsell, Spainhour, Shelley & White, P.A., by J. Merritt White, III, for defendant appellant Paul Christ Baker.*

HORTON, Judge.

This action arises out of an automobile accident on 28 August 1990. Plaintiff Carlton Blake Curry, who was 34 years old at the time, was stopped at a red light at the intersection of Sardis Road and East Independence Boulevard in Charlotte. Plaintiff's automobile was in the inside lane of two left turn lanes on Sardis Road. An automobile driven by Julie Helms was in the outside left turn lane next to him. An eighteen-wheel tractor-trailer truck driven by defendant Paul Christ Baker and owned by defendant Express Freight Systems, Inc. (collectively "defendants"), was approaching the intersection along East Independence Boulevard from the left of Helms and plaintiff. When the light governing plaintiff's lane of travel turned green, plaintiff looked left, straight ahead, right, and then straight ahead again. After plaintiff saw Helms proceed into the intersection, he also moved forward into the intersection. Neither plaintiff nor Helms saw anything prior to entering the intersection to indicate that defendants' truck would enter the intersection in violation of the traffic control signal governing its lane of travel. Plaintiff reached a maximum speed of only seven miles per hour and traveled fifty-seven feet into the intersection before striking the trailer of the truck driven by Baker just forward of its rear wheels. Although the traffic control signal governing his direction of travel was emitting a red signal, Baker entered the

intersection at a speed of approximately forty to forty-five miles per hour.

Plaintiff suffered numerous injuries as a result of the collision and later filed this action on 13 November 1995. Defendants stipulated prior to trial that their negligence caused the collision, but denied that their negligence proximately caused all of the damages asserted by plaintiff. Defendants also claimed plaintiff was contributorily negligent in that he could or should have seen the truck enter the intersection and in turn avoided the collision. Defendants presented no evidence at trial. A jury determined that plaintiff was injured as a result of defendants' negligence, that plaintiff was not contributorily negligent, and that plaintiff be awarded $900,000.00 in damages. Defendants subsequently filed motions for judgment notwithstanding the verdict JNOV and for a new trial, but the trial court denied these motions. Additional facts necessary to understand the issues will be discussed below.

I.

[1] On appeal, defendants first contend that the trial court abused its discretion by failing to grant their motions for JNOV and for a new trial, on the grounds that insufficient evidence was presented to warrant the submission of plaintiff's claim to the jury that he sustained a traumatic brain injury in the collision.

At trial, the only expert testimony plaintiff presented to support his claim that he sustained a traumatic brain injury in the collision came from Dr. Peter Jeffrey Ewert, a clinical neuropsychologist, and Elaine Parhamovich, a certified vocational evaluator. Dr. Ewert was accepted as an expert in neuropsychology without objection. Dr. Ewert testified that neuropsychology deals with traumatic brain injury, and that a closed head injury is a type of traumatic brain injury where there is no breach of the skull but the brain still suffers damage. Dr. Ewert also testified that neuropsychologists can determine whether a patient has sustained a closed head injury based on various criteria, including a history of trauma of sufficient velocity to cause the brain to become injured, neuropsychological testing, medical records, and reports from treating physicians.

Dr. Ewert testified that for the purpose of assessing plaintiff's condition, he reviewed the emergency medical technician's report made immediately after the collision. According to that report, plaintiff was not fully oriented and had impaired memory after the

collision, both signs of a closed head injury. Dr. Ewert also reviewed the report of Dr. Leon Dickerson, an orthopaedic surgeon, which indicated lacerations on plaintiff's scalp and facial area and corroborated that plaintiff hit his head. Dr. Ewert further relied on reports from neurologists Dr. Eugene Benjamin and Dr. Ronald Demas, and neuropsychiatrist Dr. Thomas Gualtieri. On cross-examination, Dr. Ewert was questioned regarding the office notes of Dr. Benjamin, and on redirect examination, Dr. Ewert read to the jury Dr. Benjamin's conclusion that plaintiff's visual problems were due to a closed head injury. Dr. Ewert was also cross-examined regarding the notes of Dr. Ronald Demas, and on redirect examination, Dr. Ewert read those notes to the jury, which indicated that plaintiff had mild post-traumatic head injury syndrome with " 'very significant cognitive deficits.' " Dr. Ewert also read the notes of Dr. Gualtieri to the jury. These notes stated that plaintiff was "status post-closed head injury" and that he suffered from persistent neuropsychological difficulties.

Dr. Ewert went on to testify that his neuropsychological testing revealed that plaintiff had attention and memory deficits consistent with an injury to the brain's temporal lobes and that plaintiff exhibited depression consistent with traumatic brain injury. Dr. Ewert later testified that plaintiff's cognitive and memory problems were a direct result of the traumatic brain injury he suffered in the collision and that he did not anticipate any improvement in plaintiff's condition.

Elaine Parhamovich, who was accepted without objection as an expert in vocational evaluation, testified that she administered tests on plaintiff after the collision to determine his academic ability, basic aptitudes, work values and interests. Parhamovich stated that although plaintiff attended college for several years, he was reading on a seventh grade comprehension level after the collision, and that this was consistent with a person who had suffered traumatic brain injury. She further testified that the results of other tests she performed on plaintiff were also consistent with those of a person who had suffered traumatic brain injury. Parhamovich stated that she had studied the relationship of traumatic brain injury to particular test scores as part of her training, and had rendered opinions on this subject on several occasions.

Several lay witnesses also testified regarding plaintiff's cognitive and memory difficulties after the collision. Betty Chatham, who worked with plaintiff both before and after the collision, testified that

before the collision, plaintiff was friendly and outgoing, and an energetic "go-getter." After the collision, plaintiff's energy level was low and he frequently came to work late, tired, and disheveled. He forgot appointments, had trouble focusing, and his conversations wandered. Plaintiff took two to three times longer to perform a task after the collision than before, and Chatham spent 40% of her time helping him.

Chuck Lickert, plaintiff's employer, testified that before the collision, plaintiff was an excellent employee who had very good organizational and record-keeping skills. However, Lickert testified that after the collision, plaintiff had trouble focusing and concentrating, and was not the same person he had been before the collision.

Plaintiff testified that as a result of the collision, he suffered lacerations to his face and scalp requiring stapling and stitches, and also suffered injuries to his shoulder and knees. He further testified that, since the collision, he has had frequent headaches and visual problems, and has had difficulty concentrating and remembering new information. He stated that he does not "feel[] that there's much of [him] there anymore." However, all objective tests performed on plaintiff, including MRIs and CT scans, returned normal results.

Defendants, citing *Martin v. Benson*, 125 N.C. App. 330, 481 S.E.2d 292, *rev'd and remanded on other grounds*, 348 N.C. 684, 500 S.E.2d 664, *reh'g. denied*, 349 N.C. 380, —— S.E.2d —— (1998), argue to this Court that Dr. Ewert and Parhamovich were incompetent to render opinions regarding the cause or existence of plaintiff's brain injury. Defendants maintain that since plaintiff failed to produce competent expert medical testimony to support his claim that he suffered a traumatic brain injury in the collision, his evidence with respect to the claim was insufficient to warrant the submission of the claim to the jury in light of *Gillikin v. Burbage*, 263 N.C. 317, 139 S.E.2d 753 (1965). For these reasons, defendants claim that the trial court abused its discretion by denying their motions for JNOV and for a new trial.

"[A] motion for judgment notwithstanding the verdict is cautiously and sparingly granted." *Bryant v. Nationwide Mut. Fire Ins. Co.*, 313 N.C. 362, 369, 329 S.E.2d 333, 338 (1985). In considering the motion, the trial court must view all the evidence supporting the nonmovant's claim as true and must consider the evidence in the light most favorable to the nonmovant, giving the nonmovant the benefit of every reasonable inference that may legitimately be drawn there-

from. *Id.* at 369, 329 S.E.2d at 337-38. Further, the decision to grant or deny a motion for a new trial rests within the trial court's discretion, and will not be overturned absent a clear showing of an abuse of that discretion. *Id.* at 380, 329 S.E.2d at 343.

In *Gillikin*, our Supreme Court held that the determination of whether plaintiff's ruptured disc (which was diagnosed six months after the accident) occurred as a result of the automobile accident with defendant was a matter outside the experience and intelligence of the average lay person, and required expert testimony to establish causation. *Gillikin*, 263 N.C. at 325, 139 S.E.2d at 760. The Court stated that:

> There are many instances in [] which the facts in evidence are such that any layman of average intelligence and experience would know what caused the injuries complained of. . . . Where, however, the subject matter . . . is "so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion, only an expert can competently give opinion evidence as to the cause of death, disease, or a physical condition."

> Where "a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony."

*Id.* (citation omitted). In reaching this conclusion, the Court observed that there were many potential causes of a ruptured disc, and that plaintiff failed to produce evidence demonstrating that her ruptured disc was caused by the accident. *Id.* at 759, 139 S.E.2d at 324-25.

In *Martin*, this Court, construing N.C. Gen. Stat. § 90-270.2(8) (1993), which defines the practice of psychology, and § 90-270.3 (1993), which restricts the practice of psychology, held that a neuropsychologist is not competent to render an opinion regarding the cause of closed head brain injury. *Martin*, 125 N.C. App. at 337, 481 S.E.2d at 296. There, the trial court allowed a neuropsychologist to testify as to her opinion that plaintiff did not suffer a closed head injury in an automobile accident with defendant. *Id.* at 333, 481 S.E.2d at 294. This testimony directly contradicted that of a neurologist who diagnosed plaintiff with a closed head injury as a result of the accident. *Id.* at 332, 481 S.E.2d at 293. Though we determined that the trial court erred in admitting the neuropsychologist's opinion

that plaintiff did not suffer a closed head injury as a result of the accident, we stated that:

> Certainly a properly qualified neuropsychologist is competent to testify as an expert about psychological and emotional conditions of a patient without expressing an opinion as to the organic causes of those conditions. Likewise, the neuropsychologist would be competent to testify as an expert that the psychological and emotional conditions of a patient are not consistent with other patients who have been medically diagnosed with brain injuries.

*Id.* at 337, 481 S.E.2d at 296.

After reviewing the record in the instant case, we conclude sufficient competent evidence was presented by plaintiff to warrant the submission of his claim that he sustained a traumatic brain injury in the collision to the jury. We first note that Parhamovich did not offer an opinion as to the cause of plaintiff's head injury; rather, she testified that the results of the tests she performed on plaintiff were consistent with those of someone who had sustained a closed head injury. Further, while Dr. Ewert testified that plaintiff suffered a traumatic brain injury caused by the collision, it is apparent that defendants did not properly object to such testimony. Defendants refer to various pages of the trial transcript and strenuously maintain that they properly objected to Dr. Ewert's testimony. However, the pages referred to by defendants demonstrate that they only objected in one instance to a hypothetical question posed to Dr. Ewert on the grounds that it was not based on the facts of the case, and in another instance to a question directed to Dr. Ewert that had previously been "asked and answered." There is no indication in the record that defendants objected to Dr. Ewert's testimony on the basis that he was incompetent to render an opinion regarding the cause or existence of plaintiff's brain injury. "The failure to object or make a timely objection 'to the introduction of evidence is a waiver of the right to do so, and "its admission, even if incompetent, is not a proper basis for appeal." ' " *Jones v. Patience*, 121 N.C. App. 434, 442, 466 S.E.2d 720, 724 (citations omitted), *appeal dismissed and disc. review denied*, 343 N.C. 307, 471 S.E.2d 72 (1996); N.C.R. App. P. 10(b)(1). Further, unlike the situation in *Martin*, Dr. Ewert's testimony corroborated the conclusions of Drs. Benjamin, Demas, and Gualtieri that plaintiff suffered a traumatic brain injury and any error in its admission was harmless.

Even if defendants had timely objected to Dr. Ewert's testimony and such testimony had been excluded, there was plenary evidence in the record to warrant the submission of plaintiff's claim that he sustained a traumatic brain injury in the collision to the jury. The reports of Drs. Benjamin, Demas, and Gualtieri, all of whom had treated plaintiff and diagnosed him with a traumatic brain injury, were admitted into evidence and read to the jury as part of Dr. Ewert's records without objection. Further, plaintiff offered extensive lay testimony linking his headaches, visual problems, and cognitive and memory difficulties to the collision. While defendants claim that, in accordance with *Gillikin*, lay testimony is insufficient to establish a causal connection between plaintiff's alleged traumatic brain injury and his accident with Baker, we observe that defendants did not demonstrate that the conditions afflicting plaintiff were caused by anything other than the collision or dispute that these types of conditions are commonly associated with traumatic brain injury. We liken the instant case to *Goble v. Helms*, 64 N.C. App. 439, 307 S.E.2d 807 (1983), *disc. review denied*, 310 N.C. 625, 315 S.E.2d 690 (1984). In *Goble*, plaintiff testified that he experienced numbness in his body after an accident with defendant, and that he had not experienced the numbness prior to the accident. *Id.* at 448, 307 S.E.2d at 814. Several other witnesses testified to a diminution in plaintiff's physical strength after the accident. *Id.* Defendants argued to this Court that the trial court erred by instructing the jury that it could award damages to plaintiff for the loss of use of part of his body due to the numbness because the evidence presented was insufficient to establish a causal connection between the accident and the numbness. *Id.* We concluded defendants' argument was without merit since plaintiff's testimony that he had experienced the numbness only after the accident established " 'facts in evidence . . . such that any layman of average intelligence and experience would know what caused the injuries complained of.' " *Id.* (quoting *Gillikin*, 263 N.C. at 325, 139 S.E.2d at 760).

In the instant case, it is undisputed that plaintiff suffered a blow to the head in the collision that was sufficient to cause deep lacerations and chip numerous teeth. As mentioned previously, several witnesses, including plaintiff, testified as to the headaches, visual problems, and cognitive and memory difficulties plaintiff suffered after the collision that he had not suffered before the collision. Because this testimony established "facts in evidence . . . such that any layman of average intelligence and experience would know what caused the injuries complained of[,]" *Gillikin*, 263 N.C. at 325, 139 S.E.2d at 760,

we believe it was properly admitted by the trial court to show that plaintiff's injuries were caused by the collision.

For the foregoing reasons, we conclude the trial court did not abuse its discretion by failing to grant defendants' motions for JNOV and for a new trial on the grounds that insufficient evidence was presented to warrant the submission of plaintiff's claim that he sustained a traumatic brain injury in the collision to the jury.

## II.

[2] Defendants next contend the trial court abused its discretion by failing to grant their motions for JNOV and for a new trial on the grounds that insufficient evidence was presented to warrant the submission of plaintiff's lost earning capacity claim to the jury.

The evidence presented at trial established that plaintiff began employment with Ideal Lighting in 1989, approximately ten months prior to the collision. Plaintiff was employed by Ideal Lighting as an outside salesperson whose duty was to develop outside clients. However, plaintiff had no financial or managerial responsibilities. Plaintiff earned $13,312.00 in 1990, and his projected annual salary for 1990 was $19,967.79. Plaintiff's tax records reveal that except for the year 1993, plaintiff's earnings increased every year after the collision. Plaintiff testified that he aspired to become the General Manager of Ideal Lighting in the future, though the position had never been offered to him. Plaintiff also testified that he did poorly in college classes relating to finance and management and that he dropped out of college with a 1.4 GPA.

Betty Chatham, plaintiff's coworker, testified that prior to the collision, plaintiff had indicated that he wanted to become the General Manager of Ideal Lighting in the future. She also testified that the General Manager of Ideal Lighting in 1990 or 1991 made approximately $30,000.00 to $35,000.00, and that the position required a good leader who could manage all aspects of the company, including management and finance. Chatham stated that, in her opinion, plaintiff could have assumed those responsibilities prior to the collision, but not after the collision.

Chuck Lickert, plaintiff's employer, testified that prior to plaintiff's collision, Ideal Lighting did not have a General Manager. He also testified that prior to the collision, plaintiff had the potential to become a General Manager, earning between $60,000.00 and $70,000.00 per year, within four or five years. He further stated that,

in his opinion, it would be very difficult for plaintiff to move forward in the lighting business after the collision. William Thiele, who employed plaintiff from 1992 until 1994, testified that based on his observations over the two years that plaintiff worked for him, plaintiff did not have the capability to advance in the lighting business.

J.C. Poindexter, Ph.D., an associate professor at North Carolina State University, was accepted as an expert in the field of economic projections relating to lost wages and future medical expenses. Dr. Poindexter testified that, in his opinion, based on the assumption that plaintiff would have developed the potential to become the General Manager of Ideal Lighting earning between $60,000.00 and $75,000.00 per year within four or five years, plaintiff's lost earning capacity claim was valued at between $640,675.00 and $1,002,477.00. In making this determination, Dr. Poindexter reviewed information provided to him by plaintiff's tax returns, Dr. Gualtieri, Parhamovich, Chatham, Lickert, and Thiele. However, Dr. Poindexter admitted that he did not know for certain that plaintiff would have become the General Manager of Ideal Lighting had the collision not occurred.

Defendants challenge the submission of plaintiff's lost earning capacity claim to the jury on three grounds: (1) that there was no competent expert medical testimony which established that plaintiff's inability to earn future wages resulted from the traumatic brain injury he allegedly sustained in the collision; (2) that the claim was based solely on speculative evidence that plaintiff aspired to become the General Manager of Ideal Lighting in the future; and (3) that Dr. Poindexter's opinion was based on speculation and inadequate data. We address each argument in turn.

With respect to defendants' argument that there was no competent expert medical testimony establishing that plaintiff's inability to earn future wages resulted from the traumatic brain injury he allegedly sustained in the collision, we note that, as discussed above, there was plenary evidence in the record to warrant the submission of plaintiff's claim that he sustained a traumatic brain injury in the collision to the jury. We therefore find this argument to be without merit.

We next turn to defendants' argument that plaintiff's lost earning capacity claim was based solely on speculative evidence that plaintiff aspired to become the General Manager of Ideal Lighting in the future. Compensation for lost earning capacity is recoverable when such loss is "the immediate and necessary consequence[] of [an]

injury." *Smith v. Corsat*, 260 N.C. 92, 95, 131 S.E.2d 894, 897 (1963). In determining the appropriate amount of compensation for such loss, "[t]he age and occupation of the injured person, the nature and extent of his employment, the value of his services and the amount of his income at the time, whether from fixed wages or salary, are matters properly to be considered by the jury[,]" and "great latitude" is allowed in the introduction of such evidence. *Id.* at 95-96, 131 S.E.2d at 897. "The right of cross-examination provides the opposing party opportunity to challenge estimates of this nature[.]" *Goble*, 64 N.C. App. at 446, 307 S.E.2d at 812.

We conclude that the trial court properly admitted testimony regarding plaintiff's aspiration to one day become the General Manager of Ideal Lighting. It was undisputed that prior to the collision, plaintiff desired to one day become the General Manager of Ideal Lighting, and that because he was on a "very good career path[,]" he had the ability to do so within four or five years. Since "great latitude" is allowed in the introduction of such evidence, *Smith*, 260 N.C. at 96, 131 S.E.2d at 897, we believe this evidence "was pertinent to a determination of the extent of [plaintiff's] damages . . . ." *Goble*, 64 N.C. App. at 446, 307 S.E.2d at 812.

Defendants cite several cases in support of their argument that plaintiff should not have been permitted to present testimony regarding his aspiration to become the General Manager of Ideal Lighting. Defendants first cite *Fox v. Army Store*, 216 N.C. 468, 5 S.E.2d 436 (1939). In *Fox*, plaintiff claimed that her earning capacity had been impaired as a result of an eye injury inflicted by defendant in 1938. *Id.* at 469, 5 S.E.2d at 437. The evidence showed that plaintiff had been employed as a teacher for several years prior to 1932, and then stopped teaching. *Id.* Plaintiff claimed she had not abandoned the teaching profession and that she attempted to upgrade her teaching certificate through correspondence courses in 1933 and 1934, but dropped the class in 1934. *Id.* She later determined to take the class again in 1938 and fulfill its requirements by 1940. *Id.* at 469-70, 5 S.E.2d at 437. The Supreme Court held that evidence of plaintiff's earning capacity should have been excluded at trial because "[w]hether [plaintiff] would have possessed the qualifications and been able to meet the educational requirements for a teacher's certificate . . . in 1940, rested in uncertainty and in the realm of speculation." *Id.* at 471, 5 S.E.2d at 437-38.

Defendants next cite *Carpenter v. Power Co.*, 191 N.C. 130, 131 S.E. 400 (1926). In *Carpenter*, the Supreme Court held that the trial

court erred by admitting evidence that plaintiff's intestate had received a letter seven or eight years before her death offering her $2,400.00 per year to sing in Richmond, Virginia, with the promise that her salary would be increased to $3,000.00 per year at the end of the first year, as evidence of her earning capacity. *Id.* at 131, 131 S.E. at 401. The trial court noted that the offer was not accepted, the letter was not in evidence, and that plaintiff's intestate had never sung for money at any prior time. *Id.* at 131-32, 131 S.E. at 401.

Defendants next cite *Thayer v. Leasing Corp.*, 5 N.C. App. 453, 168 S.E.2d 692, *cert. denied*, 275 N.C. 598 (1969). In *Thayer*, this Court held that the trial court erred by admitting evidence that plaintiff, a housewife, had held conversations with her husband about returning to work once their son began school. *Id.* at 456, 168 S.E.2d at 694. We stated that this evidence was speculative and conjectural, and that it was "too remote to be of any probative value in assessing the damages suffered by the plaintiff." *Id.*

We believe each of these cases is inapposite to the case at hand. In both *Fox* and *Thayer*, plaintiffs had not worked for a significant period and their return to work was uncertain and speculative. In *Carpenter*, plaintiff's intestate had never been employed outside the home. In the instant case, the evidence demonstrated that at the time of the collision, plaintiff was advancing on a "very good career path[,]" making promotions and future increased earnings likely. We therefore conclude the trial court properly admitted evidence regarding plaintiff's aspirations to become the General Manager of Ideal Lighting.

We next turn to defendants' argument that Dr. Poindexter's opinion of the value of plaintiff's lost earning capacity claim was based on speculation and inadequate data. In the instant case, Dr. Poindexter based his opinion as to the value of plaintiff's lost earning capacity claim in large part on the testimony of Chatham, Lickert, and Thiele, all of whom were familiar with plaintiff's work habits and with the lighting industry. Defendants had the opportunity to cross-examine each of these witnesses and Dr. Poindexter at length. Thus, we cannot "say that [Dr. Poindexter's] opinion was based on incomplete facts or incorrect inferences from those facts." *Powell v. Parker*, 62 N.C. App. 465, 468, 303 S.E.2d 225, 227, *disc. review denied*, 309 N.C. 322, 307 S.E.2d 166 (1983).

We observe that some degree of speculation is inherent in the determination of compensation for lost earning capacity claims. With

respect to such determinations made in wrongful death claims, which we find analogous to the situation in the case at hand, our Supreme Court has stated that:

> The present monetary value of the decedent to the persons entitled to receive the damages recovered will usually defy any precise mathematical computation. Therefore, the assessment of damages must, to a large extent, be left to the good sense and fair judgment of the jury—subject, of course, to the discretionary power of the judge to set its verdict aside when, in his opinion, equity and justice so require. The fact that the full extent of the damages must be a matter of some speculation is no ground for refusing all damages.

*Brown v. Moore*, 286 N.C. 664, 673, 213 S.E.2d 342, 348-49 (1975) (citations omitted). The defendants' objection to Dr. Poindexter's opinion as to the value of plaintiff's lost earning capacity goes to its weight rather than its admissibility. Thus the trial court did not err in admitting Dr. Poindexter's opinion for the consideration of the jury. We further note that the jury awarded plaintiff damages in an amount well below the highest value Dr. Poindexter estimated for plaintiff's lost earning capacity claim, and that presumably the amount awarded was intended not only to compensate plaintiff for this claim, but also for his past and future medical expenses.

For the foregoing reasons, we conclude the trial court did not abuse its discretion by failing to grant defendants' motions for JNOV and for a new trial on the grounds that insufficient evidence was presented to warrant the submission of plaintiff's lost earning capacity claim to the jury.

III.

[3] Defendants next contend that the trial court erred by failing to instruct the jury on a driver's duty to reduce speed to avoid a collision and a driver's duty to determine that movement can be made safely before turning, and that they are entitled to a new trial on this ground.

After reviewing the record, we conclude the trial court did not err by failing to give the instructions requested by defendants. The trial court instructed the jury on a driver's duty to keep a reasonable lookout and a driver's duty upon entering an intersection under a green light. We believe these instructions fully and fairly presented the issues arising from defendants' contentions. *See Moss v. J.C.*

*Bradford and Co.*, 110 N.C. App. 788, 794, 431 S.E.2d 531, 534 (1993), *rev'd on other grounds*, 337 N.C. 315, 446 S.E.2d 799 (1994).

Even if the trial court erred by failing to give defendants' requested instructions, such error would not have been prejudicial to defendants in light of the fact that the issue of plaintiff's contributory negligence should not have been submitted to the jury. In *Cicogna v. Holder*, 345 N.C. 488, 489, 480 S.E.2d 636, 637 (1997), our Supreme Court held that the issue of contributory negligence should not have been submitted to the jury where plaintiff entered an intersection pursuant to a green light, and there was nothing to put plaintiff on notice that defendant would not obey the red traffic light governing his direction of travel. Likewise, in the instant case, there is no evidence in the record of anything which would have put plaintiff on notice that the truck was going to enter the intersection contrary to the red light governing its direction of travel. In any event, because the jury found that plaintiff was not contributorily negligent, we decline to further address this point.

We have carefully reviewed defendants' remaining assignments of error and find them to be without merit.

Affirmed.

Chief Judge EAGLES and Judge WALKER concur.